# In the United States Court of Federal Claims
### OFFICE OF SPECIAL MASTERS
### No. 16-1580V
### Filed: March 30, 2021

| | | |
|---|---|---|
| JAMES ABDELNOUR,<br><br>Petitioner,<br><br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>Respondent. | * * * * * * * * * * * * * | UNPUBLISHED<br><br>Findings of Fact; Onset;<br>Influenza ("Flu") Vaccine; Chronic<br>Inflammatory Demyelinating<br>Polyneuropathy ("CIDP"). |

*Jeffrey Pop*, Jeffrey S. Pop & Associates, Beverly Hills, CA, for Petitioner
*Laurie Wiesner*, U.S. Department of Justice, Washington, DC, for Respondent

## RULING ON ONSET[1]

**Oler**, Special Master:

On November 29, 2016, James Abdelnour ("Petitioner") filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10, *et seq*.[2] (the "Vaccine Act" or "Program"). The petition alleges that he suffered from Guillain-Barré syndrome

---

[1] Because this unpublished Ruling contains a reasoned explanation for the action in this case, I intend to post it on the United States Court of Federal Claims' website, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the Ruling will be available to anyone with access to the internet.** However, the parties may object to the Ruling's inclusion of certain kinds of confidential information. Specifically, under Vaccine Rule 18(b), each party has fourteen days within which to request redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b). Otherwise, the whole Ruling will be available to the public. *Id*.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

1

and chronic inflammatory demyelinating polyneuropathy ("CIDP") as a result of the influenza vaccine he received on September 11, 2014. Pet. at 1, ECF No. 1.

After carefully considering the medical records, the affidavits, the documentary evidence, and the witness testimony, I find that Petitioner's CIDP began around mid-October 2014.

## I.     Procedural History

In support of his Petition, Petitioner filed medical records and massage therapy records on December 5, 2016 (Exs. 3-19); which were re-filed on March 1, 2021, August 25, 2020 (Exs. 56-64) and March 4 and 5, 2021 (Exs. 83-84). Petitioner filed a declaration on December 5, 2016 (Ex. 1) and a supplement affidavit from Soniya Roderiques on February 11, 2021 (Ex. 65).

On June 26, 2017, Respondent filed a Rule 4(c) Report, concluding this case was not appropriate for compensation under the terms of the Vaccine Act. Respt's Rep. at 1, ECF No. 16. On October 24, 2017, Petitioner filed an expert report from Dr. Lawrence Steinman. Ex. 21, ECF No. 24. Petitioner filed medical literature cited in Dr. Steinman's report on November 1, 2017. Exs. 22-45.

This case was re-assigned to my docket on December 6, 2017. ECF No. 31. Respondent filed an expert report from Dr. Eric Lancaster on February 26, 2018. Ex. A, ECF No. 32. On September 16, 2019, Petitioner filed a supplemental expert report from Dr. Steinman. Ex. 46, ECF No. 34.

On November 18, 2019, I held a status conference with the parties to discuss the possibility of a litigative risk settlement. ECF No. 35. Respondent's counsel requested 30 days to speak with his client and 45 days to file a supplement expert report from Dr. Lancaster. *See id.* at 1. I granted that request. *See id.* On December 18, 2019, Respondent filed a status report stating he was not interested in settlement. Pet'r's Status Rep. on 12/18/19 at 1, ECF No. 36. On April 20, 2020, Respondent filed a supplement expert report from Dr. Lancaster and a report from Dr. Yang Zhang. Ex. DD, ECF No. 39; Ex. M, ECF No. 40.

On July 1, 2020, I held a status conference with the parties to discuss dates for an entitlement hearing. ECF No. 43. I again encouraged the parties to consider a litigative risk settlement. *See id.*

On August 25, 2020, Petitioner file a status report stating he had submitted a settlement demand to Respondent. ECF No. 47. On August 28, 2020, I scheduled an entitlement hearing for March 11 and 12, 2021. Scheduling Order dated 8/28/2020. On November 2, 2020, Respondent filed a status report stating he was not interested in settlement at this time. ECF No. 50.

On March 11 and 12, 2021, I held an entitlement hearing via Zoom. *See* Minute Entry on 3/12/2021. At the beginning of the hearing, Petitioner's counsel, Mr. Pop, indicated he believed the crux of this case revolved around the onset of Petitioner's CIDP and asked if I would rule on that issue alone. At the end of the entitlement hearing, I informed the parties that I would conduct a status conference where I would orally convey my findings with respect to onset.

On March 19, 2021, I held a status conference and provided oral findings regarding the issue of onset. *See* Minute Entry on 3/19/2021. These written findings summarize the findings I discussed with the parties during this status conference.

## II.     Legal Standard Regarding Fact Finding

Petitioner bears the burden of establishing her claim by a preponderance of the evidence. 42 U.S.C. § 300aa-13(1)(a). A petitioner must offer evidence that leads the "trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he or she] may find in favor of the party who has the burden to persuade the judge of the fact's existence." *Moberly v. Sec'y of Health & Hum. Servs.*, 592 F.3d 1315, 1322 n.2 (Fed. Cir. 2010) (citations omitted).

In order to make a determination concerning factual issues, such as the timing of onset of petitioner's alleged injury, the special master should first look to the medical records.  "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium." *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993); *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03-1585V, 2006 WL 3734216, at *8 (Fed. Cl. Spec. Mstr. Nov. 29, 2006). Medical records created contemporaneously with the events they describe are presumed to be accurate and complete. *Doe/70 v. Sec'y of Health & Hum. Servs.,* 95 Fed. Cl. 598, 608 (2010).

Contemporaneous medical records generally merit greater evidentiary weight than oral testimony; this is particularly true where such testimony conflicts with the record evidence. *Cucuras*, 993 F.2d at 1528; *see also Murphy v. Sec'y of Health & Hum. Servs.*, 23 Cl. Ct. 726, 733 (1991), *aff'd*, 968 F.2d 1226 (Fed. Cir. 1992)(citing *United States v. United States Gypsum Co.*, 333 U.S. 364, 396 (1947) ("It has generally been held that oral testimony which is in conflict with contemporaneous documents is entitled to little evidentiary weight")). "Written documentation recorded by a disinterested person at or soon after the event at issue is generally more reliable than the recollection of a party to a lawsuit many years later." *Reusser v. Sec'y of Health & Hum. Servs.*, 28 Fed. Cl. 516, 523 (1993).

However, there are situations in which compelling oral testimony may be more persuasive than written records--for instance in cases where records are found to be incomplete or inaccurate. *Campbell*, 69 Fed. Cl. at 779 ("like any norm based upon common sense and experience, this rule should not be treated as an absolute and must yield where the factual predicates for its application are weak or lacking"); *Lowrie*, 2005 WL 6117475, at *19 ("Written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent") (quoting *Murphy*, 23 Cl. Ct. at 733).

When witness testimony is used to overcome the presumption of accuracy afforded to contemporaneous medical records, such testimony must be "consistent, clear, cogent, and compelling." *Sanchez v. Sec'y of Health & Hum. Servs.*, No. 11-685V, 2013 WL 1880825 (Fed. Cl. Spec. Mstr. Apr. 10, 2013) (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90-2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)). In determining the accuracy and

completeness of medical records, the Court of Federal Claims has suggested four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1334 (Fed. Cir. 2014). A special master making a determination whether to afford greater weight to contemporaneous medical records or other evidence, such as testimony at a hearing must have evidence suggesting the decision was a rational determination. *Burns by Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993).

### III.   Findings of Fact

The issue of onset in this case is complicated by Petitioner's pre-existing diabetic neuropathy. Parsing the distinction between these two diseases is not entirely straightforward. Petitioner's expert, Dr. Steinman, testified that Petitioner most likely began to experience symptoms of CIDP in the mid-October 2014 timeframe. Respondent's expert, Dr. Lancaster, testified that Petitioner's symptoms began around late November 2014. Both sides find support for their positions in the medical records. In other words, some of the medical records contradict other records filed in this case. Because of that, this issue is a close one. Ultimately, I find that the preponderance of the evidence favors an onset of CIDP in the mid-October 2014 timeframe.

On October 16, 2014, Petitioner visited his cardiologist, Dr. Milan. During this appointment, Petitioner reported fatigue, difficulty walking, numbness, and weakness. Ex. 4 at 106. This visit represented the first time that weakness appeared in Petitioner's medical records after his flu vaccine. Dr. Lancaster has opined that the notation of weakness in the medical records signifies the beginning of Petitioner's disease. "If the sensory symptoms [in June] were actually due to diabetic neuropathy, then we should date his CIDP to the onset of weakness." First Lancaster Rep. at 4.

This particular appointment on October 16, 2014 can be compared with Petitioner's previous visit with Dr. Milan on September 25, 2014. When describing the September visit in his expert report, Dr. Lancaster stated, "A review of symptoms was negative for some symptoms of neuropathy such as numbness and weakness." First Lancaster Rep. at 2; *see also* Ex. 4 at 108-11. These two records (from the same provider) indicate that in September, Petitioner was not experiencing numbness or weakness, but demonstrate that he was experiencing these symptoms in mid-October.

During the entitlement hearing, Dr. Lancaster testified that the term "weakness" from this October 16, 2014 record should be discounted because the objective examination did not confirm Petitioner's weakness. While this evidence would be stronger if it had been corroborated with physical exam findings, I find that this notation still supports an onset of weakness in the mid-October timeframe, and thus an onset of CIDP.

4

On October 18, 2014, Petitioner did not attend a wedding due to his condition. Petitioner's and Ms. Roderiques' testimony were credible and consistent with the medical records filed in this case. Petitioner's inability to attend this event supports the proposition that his disease course was worsening.

The November 5, 2014 records from Caregiver Homes note that Petitioner had to use a walker or crutch while walking outside. Ex. 58 at 62. This record also suggests the further progression of Petitioner's disease and is consistent with onset of CIDP in the mid-October timeframe (as opposed to the late November timeframe suggested by Dr. Lancaster).

On November 19, 2014, Petitioner saw Dr. Vallone and reported symptoms of difficulty walking, painful legs with exercise, numbness, and weakness. Ex. 7 at 180; Ex. 8 at 1-5.

During late November and early December 2014, Petitioner fell several times. This was documented in Ms. Roderiques' calendar and in a phone call to New Bedford Community Health Center. Ex. 66 at 17; Ex. 83 at 12.

On January 10, 2015, Petitioner was admitted to the Brigham & Women's Hospital Emergency Department with a chief complaint of weakness. Ex. 10 at 97-98. Petitioner noted that "in mid-October [] his legs were getting more easily exhausted again and he didn't have the same energy. Over the last 4-6 weeks, the weakness has progressed more quickly." *Id.* at 97. This notation indicates that the terms "easily exhausted" and "weakness" are synonymous. Based on this January 10, 2015 record, Petitioner's weakness began in mid-October 2014.

In an attending note dated 1/12/2015 from Sarah Frasure, M.D. Attending/Fellow, the records document that Petitioner's symptoms had been going on for a few months but had recently increased to the point where he could no longer get up the stairs of his house without his wife pushing him from behind. Ex. 10 at 101. The notation of "a few months" is consistent with an onset of symptoms in mid-October 2014 coupled with a subsequent worsening.

On September 10, 2018, Petitioner had his first appointment with Dr. Christopher Doughty, a neurologist. Dr. Doughty noted in the HPI section of that record that Petitioner's CIDP "symptoms progressed over a six-week period after the flu shot leading to an admission at BWH in January 2015." Ex. 57 at 185. Six weeks after Petitioner's September 11, 2014 vaccination is October 23, 2014. This entry also supports an onset of Petitioner's CIDP in the mid-October 2014 timeframe.

There are several medical records which suggest a later onset of CIDP. *See e.g.* Ex. 10 at 183, (a January 12, 2015 Brigham and Women's Hospital Occupational Therapy evaluation noting that prior to November 2014, Petitioner had "returned to being independent with basic ADL's and functional mobility" and that since November, "he has progressively required more assistance w/mobility and ADL's."); Ex. 10 at 9 (noting that Petitioner's symptoms began approximately six weeks before his January 10, 2015 hospital admission); Ex. 56 at 10 (noting that Petitioner's CIDP started around November 2014).

I have considered these records which suggest an onset in November 2014 in arriving at my determination. As delineated above, the medical records in this case are not entirely consistent with one another. However, I find that the preponderant weight of the records suggests that the onset of Petitioner's CIDP began in mid-October 2014. The affidavits submitted by and on behalf of Petitioner, the testimony, and the other documentary evidence also support Petitioner's case, and work in concert with the medical records to help Petitioner meet his burden.

The following is therefore **ORDERED**:

By **Monday, April 26, 2021**, Respondent shall file a status report indicating how he would like to proceed.

**IT IS SO ORDERED.**

                                        **s/ Katherine E. Oler**
                                        Katherine E. Oler
                                        Special Master